Whitaker, Judge,
concurring:
The majority opinion quite adequately demonstrates that plaintiffs have no claim against the United States either at law or in equity and good conscience; but I cannot resist adding this comment: Even if there had been a positive misrepresentation by some Government official, a failure to disclose what defendant was under a duty to disclose, Congress has expressly said the United States is not liable therefor. Considering all the pros and cons, and balancing the public interest against individual injury, Congress decided that right and justice dictated that no individual should recover damages from his Government for that sort of thing. If the public generally cannot recover, how can it be “equitable” to permit some special individual to do so, absent some special circumstance applicable to this particular individual and not to the general public. As the majority opinion well demonstrates, no such special circumstance exists in this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Saul Eichard Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. (a) During 1956, there was in existence a partnership known as Suffolk Farms Packing Company, composed of *120 three individuals, James William O’Donnell, Salvitore de Tucci, and Arnold Wolf. These individuals organized this partnership around 1941. The partnership’s office was located in Chelsea, Massachusetts. Arnold Wolf (the only one of the three partners who testified in this case), is the member of the partnership who was most active on the matters herein involved.
(b) During said year 1956, there also was in existence a corporation organized under the laws of the Commonwealth of Massachusetts known as Suffolk Farms Packing Company, Inc., with its principal place of business also in Chelsea, Massachusetts. This corporation was organized about November 1950, its officers and stockholders consisting of the above-mentioned three individuals.
(c) Plaintiffs in this case are said three individuals acting in their partnership capacity. They seek to recover losses they suffered arising out of certain shipments of potatoes made in 1956 by the partnership to Swedish purchasers. There is no evidence in the record as to the citizenship of said three individuals.
(d) Said individuals were dealers in interstate commerce in fresh fruits and vegetables. All such dealers are required to have a license issued by the United States Department of Agriculture under the Perishable Agricultural Commodities Act. Up to 1959, all such licenses have been issued to Suffolk Farms Packing Company, Inc. upon applications submitted by these individuals as corporation officials. On their 1958 renewal application, the Company was, apparently inadvertently, described as a partnership. Upon inquiry by the Department concerning the apparent change in the Company’s ownership, a letter from the Company to the Department stated that the partnership data was erroneously set forth, and that there had been no change in the Company’s status as a corporation. The renewal license was thereupon issued to the corporation.
(e) Despite the formation of the corporation in 1950 and the issuance thereafter of Federal licenses to the company as a corporation upon their applications therefor as a corporation, plaintiffs continued (for some reason not disclosed by the record) to act as partners until January 1,1959, up to *121 which, time the corporation remained nnnsed as an entity for the transaction of business. On that date, however, the corporation was activated and all partnership assets were transferred to the corporation.
(f) The term “plaintiff” will be used hereafter to describe the “Suffolk Farms Packing Company” partnership for it is in that form in which plaintiffs conducted their business during 1956.
2. Wolf & Wolf, N.Y., is a corporation organized in 1953 under the laws of Holland. It engages in transactions pertaining to the import and export of agricultural products, particularly potatoes. Arnold Wolf, one of the three individuals referred to in finding 1, is also the president of this Dutch corporation. Since its incorporation, such corporation has had close business relationships with plaintiff. In such international transactions as the import and export of agricultural products where plaintiff is the principal, Wolf & Wolf, as plaintiff’s agent, arranges on a commission basis for such matters as the financing thereof, principally through foreign hank credits, and for such other details of an international nature as are involved in carrying out such transactions.
3. (a) Most countries have an organized plant protection service which controls the conditions incident to the importing and exporting of vegetables, including potatoes. The concern is principally with the health of the plants. Each country has a list of plant and vegetable diseases and pests considered by it to be dangerous, and the import of plants and vegetables containing such pests and diseases is prohibited. Such conditions concerning the health of imported and exported plants is referred to as phytosanitary [plant health] conditions. Pursuant to an international convention (the Eome Convention of 1951), all members of the Convention are required to provide an effective control and inspection service. In Sweden, this is the function of the Swedish Plant Protection Institute. At the times herein involved, one Granhall was the Director of the Institute.
(b) Since 1876 Sweden had prohibited the importation of potatoes from the United States, although the Swedish Plant Protection Institute could grant exceptions. The *122 basis of the prohibition was the prevention of the introduction into Sweden of the Colorado potato beetle, which exists throughout the United States.
(c) There is in existence in Paris, France, an international organization called the European Plant Protection Organization, one of the functions of which is to make recommendations to member countries concerning plant diseases to be placed on forbidden lists. In the fall of 1955, the Organization recommended to all of its European members, including Sweden, that ring rot be considered a dangerous potato disease and that it be added to the list of forbidden diseases preventing the import of potatoes so infected to their countries. The Organization, which attempts to obtain uniform action by its members, wanted to keep the disease out of Europe.
When the Swedish Institute received this recommendation in the fall of 1955, it did not consider the disease as being especially dangerous to Sweden, where it had not theretofore been known to exist, and consequently had no particular concern regarding it. The disease had not theretofore been included on its forbidden list. However, to cooperate, as a member, in the work of the Organization, as well as to be assured against the possibility of a future outbreak of the disease in Sweden, the Swedish “Poyal Board of Agriculture,” at the instance of the Swedish Plant Protection Institute, by a promulgation issued on September 19, 1955, followed the Organization’s recommendation and, in a revision of the entire list, added ring rot to the list of diseases which Sweden considered to be dangerous.
Potatoes infected with ring rot are not dangerous for human consumption. The danger arises from potatoes so infected being used as seed potatoes. When so used, the disease may settle in the soil on the farms and spread throughout the country.
(d) At that time, a Swedish statute provided that fruits, plants and vegetables affected by plant diseases or parasites listed by the Swedish Board of Agriculture as being particularly dangerous for Swedish plants could not be imported. The inclusion of “ring rot of potatoes” in the Board of Agriculture’s list of “plant diseases, plant parasites and pests *123 which are considered to be particularly dangerous to Swedish agriculture and horticulture” thus prevented the import of potatoes so infected into Sweden. The statute, however, provided that in special cases, the Swedish Plant Protection Institute, which was vested with the power to inspect imported produce, could, “subject to such conditions as the Institute may prescribe, grant exemption from the prohibition” against such imports.
4. As part of the procedure incident to the import and export of potatoes, all members of the Nome Convention of 1951, including Sweden and the United States, agreed that a phytosanitary certificate should be executed by an authorized and competent official of an appropriate plant protection service of the exporting country stating in effect that the potatoes have been inspected and that they are, to the best of the official’s knowledge, free from the pests and diseases considered to be dangerous by the country to which the potatoes are being sent.
The form of the certificate is substantially the same in all of the countries subscribing to the Convention. The standard form in use in 1955 and 1956 in itself made no mention of ring rot. For a complete list of a particular country’s prohibited pests and diseases, reference would have to be made to the individual country’s laws or regulations. The certificate did, however, specifically refer to the Colorado beetle and some other insects and diseases, but also contained a space following the words “Additional declaration” in which any particular statements concerning the individual country’s regulations could be inserted. The form also contained a statement that “the consignment is believed to conform to the current phytosanitary regulations of” the importing country “both as stated in the additional declaration and otherwise.”[12]
5. The various countries attempt, by numerous methods, to keep each other advised of their phytosanitary conditions so that exporters and importers will be cognizant of the requirements involved and also so that the inspecting officials *124 in the exporting countries will have such, knowledge of the importing country’s regulations as to enable them to execute the phytosanitary certificate accompanying the shipment and to certify thereon that the shipment does meet the importing-country’s phytosanitary conditions. Since there are, however, so many countries, plants and regulations, it is not a simple matter for any particular country to collect all the regulations of all countries and constantly to keep them current in the language of the collecting country.
Knowledge of the adoption by foreign countries of new regulations is obtained in many ways. The European Plant Protection Organization frequently acts as a clearing house. Member countries send to the Organization new phytosani-tary regulations as they are adopted and the Organization in turn transmits copies to all members, as well as, normally, to the United States. In addition, the country adopting the new regulation may furnish copies thereof to the different embassies located in such country for transmittal, either in translated or untranslated form, by such embassies to their home countries. Sometimes the necessary information is obtained through various publications, such as trade journals.
6. (a) The Plant Quarantine Division of the Agricultural Research Service (ARS), United States Department of Agriculture, is the Federal governmental body charged with the duty of inspecting and certifying products for export, as hereinabove set forth. To perform these functions, it attempts to keep current by the methods described in finding 5, with respect to the import requirements and restrictions of the various foreign countries. Such requirements are distributed to all of the ARS field stations throughout the country so that their inspectors will have the requisite data upon which to make their inspections and to execute the necessary certificates when shipments are presented to them for export.
Another important purpose of compiling and maintaining such data is to perform a service to growers and exporters, many of whom make inquiry concerning the regulations of particular countries with respect to specific commodities. *125 The United States has a surplus of many agricultural commodities, such as potatoes, and their export is encouraged by the Department.
(b) The AES compiles and issues the data concerning the phytosanitary regulations of the foreign countries in the form of “summaries.” The normal and typical process by which such summaries were prepared and issued in 1955 and 1956 was as follows:
The Agricultural Attache of the United States Embassy in the foreign country received the regulation of such country. He would then transmit it to the AES in Washington, either in translated or untranslated form. If untranslated, AES would have it translated. The regulation would then be summarized, since upon translation it is often in legal terms incomprehensible to the average layman, and it must consequently be put into such language as will be understandable to the AES inspectors and such other persons who may use them. At the time herein involved, such summariza-tions were prepared by the AES office in New York City. Upon the completion of the summarization, the summary was then returned to the Agricultural Attache in the foreign embassy who referred it back to the foreign country’s plant protection service to make certain that the summary was correct and did not, through the process of translation and summarization, become inaccurate. The summary was then returned to AES by the Agricultural Attache together with any comments or suggestions by the foreign country’s plant protection service. It was then prepared in final form and distributed to the various AES field offices. Further distribution was made to the States and territories since AES works closely with them. Many foreign countries will accept certifications by State as well as Federal officials, and the States for the most part rely on the data furnished by AES. In addition, the summary is available for distribution to exporters or to any other interested person.
(c) The AES attempts to keep current with, and to publish summaries concerning, the regulations of 127 foreign countries on all kinds of plant products, fruits, and vegetables. The preparation of these summaries, including the *126 translations, transmissions, checking, reproduction and distribution, is a process of varying length. Because of its uncertainty as to whether these summaries were, at any particular moment, up-to-date and accurate, the Department of Agriculture placed the following statement on the face of all summaries, and repeated this qualification in oral discussions with interested parties:
The information contained in this circular is believed to be correct and complete up to the time of preparation, but it is not intended to be used independently of, nor as a substitute for, the original texts, and it is not to be interpreted as legally authoritative.
7. The incorporation of the Swedish regulation concerning ring rot into a summary as above described took place as follows: As stated, in September 1955 Sweden revised the list of plant diseases and pests that it considered dangerous and at that time included ring rot on the list. A copy of the promulgation containing this list, translated into English, was delivered to the Agricultural Attache of the United States Embassy in Stockholm on November 18, 1955. The Attache then transmitted the list to the Department of Agriculture in Washington, D.C., which received it sometime during said month of November. The office of the Plant Quarantine Division of the Agricultural Research Service then made copies of the promulgation for retention in its office in Washington and then transmitted the promulgation to its New York City office for summarization. Due to personnel shortage problems, the New York office did not complete its summary until August 1956. The time thus taken to complete the summary was longer than normal. The summary was then returned to the Agricultural Attache in Stockholm for transmittal to the Swedish Plant Protection Service so that the Service could check its accuracy. It was then returned to the Department of Agriculture together with 12 pages of corrections and comments by Granhall, the Director of the Swedish Service. The summary was then revised and corrected by ARS and published in final form on November 7,1958.
Thus, approximately a year elapsed between the receipt of the promulgation in translated form by the Department *127 of Agriculture in November 1955 to its final publication in summary form in November 1956.
8. In the early months of 1956, there was a shortage of potatoes in many European countries resulting from a drought in the northern part of Europe during the previous summer months and a consequent smaller than usual 1955 potato crop. Further, an unusually severe 1955-56 winter resulted in a belief that the shortage would be aggravated because of expected freezing damage to potatoes stored in ground pits. As a result, potato prices in these European countries were high.
Wolf & Wolf’s principal business was the export of potatoes. Among other transactions, it was engaged in the export of potatoes from Holland and Belgium to England. It followed closely the European potato markets. Arnold Wolf had been a potato broker for approximately 84 years.
Because of the potato shortage, Wolf & Wolf concluded that it might be possible to find a market in Europe for United States potatoes. Such potatoes are not customarily imported into Europe. Ocean freight rates make it difficult for United States potatoes to compete with those grown in Europe. In any event, most European countries have restrictions upon their importation, principally due to the existence in the United States of the Colorado beetle. However, in periods of local shortage, waivers of such restrictions against the importing of United States potatoes are sometimes obtainable.
Wolf & Wolf eventually decided that, in this period of shortage, Sweden offered the most attractive market for the import of United States potatoes, and that it would attempt to secure potatoes under the inch size which are acceptable in Sweden as table potatoes. Such small potatoes are not normally acceptable in most countries for such purpose, and are consequently not usually exported from the United States. In this country, they are sometimes used in starch manufacture or as cattle feed. They may even be left in the fields and plowed back.
9. (a) Sometime during January 1956, Izaak Wolf (being the other member of the Wolf & Wolf concern) discussed with an official of the Department of Agriculture in Wash *128 ington, D.C., where in the United States potatoes could be purchased for export to Europe at the lowest price. There was a large surplus of potatoes in the United States at that time, and prices were low. The official advised Wolf that, for export to Europe, the lowest prices and freight were in Aroostook County, Maine. At this time there was no reference to the import regulations of any particular European country.
(b) At about the same time, Arnold Wolf contacted Swedish commercial channels to ascertain whether they would be interested in purchasing table potatoes from the United States which were under the 2y2-inch size. At that time, as hereinabove set forth, the Swedish regulation concerning ring rot had been promulgated, but Arnold Wolf did not know about it. Further, the Swedish commercial channels apparently did not know about it either. In any event, they did not specifically apprise Arnold Wolf thereof. However, Arnold Wolf did obtain from such commercial sources a form of Swedish phytosanitary certificate. He made no other inquiry of such sources concerning Swedish potato import regulations. The form of certificate he obtained did not specifically mention ring rot. At this time, Arnold Wolf made no inquiry from any Swedish governmental source as to Swedish potato import regulations, nor did he obtain such regulations from any commercial or governmental source.
(c) At that time, Arnold Wolf had only a general knowledge of the import regulations of certain countries, it not being possible to know all the regulations of all the countries at any particular time. His experience has principally been in exporting produce from Holland, which has an extensive phytosanitary service (the Holland Phytopathological Service) upon which he places great reliance for exports from Holland, although he places primary reliance upon the purchaser’s own knowledge concerning what he can import into his own country and under what conditions. In this instance, he was placing reliance upon the form of Swedish phytosanitary certificate which the Swedish commercial sources had given him. This was in accordance *129 with his usual practice. In his 34 years as a potato broker, he had never, prior to shipping produce to a foreign country, directly contacted such foreign country’s appropriate governmental entity as an initial matter to obtain therefrom the foreign country’s import regulations. He had engaged for many years in exporting potatoes from Holland to Sweden and had not encountered any difficulty therewith. Although the Colorado beetle does exist in certain areas of Holland, it does not exist in other areas, and the Dutch inspectors are able to certify that potatoes from such non-infected areas meet Sweden’s requirements concerning such insect, as set forth on the phytosanitary certificate. However, he had never previously participated in any potato export transactions from the United States to Sweden.
The practice of Maine exporters of potatoes generally is the same as was adopted by Arnold Wolf. The exporter normally directs his inquiry concerning the import regulations of the foreign country to the Maine or the United States Departments of Agriculture, which work closely together. However, an exporter sometimes will make his own direct inquiry of the officials of the foreign country concerning their regulations.
10. So far as is here material, the form of phytosanitary certificate which Arnold Wolf obtained from the Swedish commercial sources read as follows:
This is to certify that the consignment of potatoes described below or a representative sample was thoroughly examined on the_of _ 19_by _an authorized officer of the Plant Protection Service of_and was found to the best of his knowledge to be substantially free from injurious diseases and pests; and that the consignment is believed to conform with the current phytosanitary regulations of Sweden both as stated in the additional declaration hereon and otherwise.
* * * * *
Additional declaration:
It is further certified
* * * * %
3. that the potatoes were found to be healthy, no evidence of the presence of wart disease * * *, potato *130 root eelworm * * *, potato moth * * *, Colorado beetle * * * or Japanese beetle * * * having been found in them ;
* ¡¡c * *
5. that the Colorado beetle and Japanese beetle have not occurred in the place of cultivation nor within a distance of 2 km. from that place during the last 2 years.
_19—
Signed
(Official position)
(Seal of the Service)
Description of the consignment: * * *
11. Arnold Wolf came to the United States in February 1956 with the Swedish form of phytosanitary certificate he had obtained and conferred with his associate Izaak Wolf. Since it appeared, as ascertained by Izaak Wolf, that the proposed exports would in all probability consist of Maine potatoes, it was agreed that Izaak Wolf would take the certificate to Maine to ascertain from the appropriate Maine officials whether they could execute such a Swedish certificate with respect to Maine potatoes. Shortly thereafter, Arnold Wolf returned to Holland.
12. By letter of March 7,1956, the Agricultural Attache of the American Embassy in Stockholm, Sweden, advised the Foreign Agricultural Service of the United States Department of Agriculture of the then current considerable interest in Sweden in importing United States potatoes, of a number of inquiries the Embassy had received from Swedish firms, and of the grant by the Swedish Agricultural Marketing Board of a few licenses to Swedish importers to import a relatively small amount of Maine potatoes “on a trial basis.” The letter further stated, however, that Granhall had advised that, due to the failure of the Swedish importers to inform the Maine exporters, the phytosanitary certificates covering the first shipments of Maine potatoes did not meet the Swedish requirements and that Granhall had delivered to the Embassy sample copies of the Swedish certificates that would be required, which the Attache enclosed with the letter “for such action as you deem appropriate.” The letter went *131 on to state that the potato situation still “remains short with rising prices for such imports from Western Europe as can be made.”
The record discloses nothing further about the “trial” shipments of Maine potatoes referred to in this letter.
The form of the certificate Granhall delivered to the Embassy and transmitted by the Embassy with the letter was identical with that which Arnold Wolf had obtained from the Swedish commercial sources. It did not mention ring rot. Similarly, Granhall made no mention of ring rot to the Attache, nor did the Attache in turn make any mention of it in his letter to the Department of Agriculture. It is common knowledge that all areas of the United States in which potatoes are grown, including Maine, are infected with ring rot. As set forth in finding 3, Granhall at that time was not concerned with ring rot and apparently gave it no thought. Seemingly he had forgotten that he himself had caused ring rot to be included in the Swedish list of dangerous diseases in September 1955.
13. On or about March 15, 1956, a meeting of several United States Department of Agriculture officials was had concerning the Attache’s letter of March 7, 1956, and the general problems involved in exporting United States potatoes to Sweden. Among others, there was present at the meeting H. J. Conkle, Chief Staff Officer of the Plant Quarantine Division, Agricultural Eesearch Service, who was in direct charge of export certification matters, and who was requested to furnish information with regard to the Swedish requirements on the importation of potatoes. There was no mention of ring rot at this meeting, although the Swedish regulation concerning ring rot was available in Conkle’s office in translated form at that time and had been there since November 1955. Conkle did not refer to his office files containing such regulation since he made no attempt to ascertain whether they contained any Swedish regulations subsequent to the publication of the last Swedish summary on February 14,1950, which his Division and inspectors were still using. At that time, no record was kept by the Division *132 of newly promulgated foreign regulations which, were in the process of summarization by the Division.[13]
14. On or about March 26,1956, Izaak Wolf went to Maine in accordance with the arrangements set forth in finding 11, and discussed with E. L. Newdick, Chief of the Division of Plant Industry, Department of Agriculture of the State of Maine, the question of whether the Maine inspectors could execute the form of certificate which Arnold Wolf had obtained from Sweden. Newdick advised that his department could not certify, as the Swedish certificate required, that Maine potatoes had been grown in an area where the Colorado beetle did not occur. The Maine Department of Agriculture maintains and places chief reliance upon its files of the regulations of other countries which consist of the summaries thereof as they are prepared and forwarded to it by the United States Department of Agriculture. As set forth above, the United States Department of Agriculture had not as yet issued the new summary of the Swedish regulations, which included the ring rot regulation, so that Newdick knew nothing of it, as was also true of Izaak Wolf. Consequently, there was no mention at that time of ring rot by either Wolf or Newdick. The latest summary of Sweden’s “Plant Quarantine Import Restrictions,” which Newdick checked, was, as stated, published by the Department of Agriculture on February 14,1950.
At that time, Newdick telephoned Conkle in Washington concerning Sweden’s certificate requirements and to make certain that there had not been any waiver by Sweden of the Colorado beetle prohibition. The officials of the Maine and the United States Departments of Agriculture cooperate closely on such matters. Conkle advised that he knew of no such waiver, that without such a waiver by Sweden of the requirement of the Swedish certificate (referred to as “point 5”) it would not be possible for any United States inspector to execute the Swedish certificate, and that Wolf’s company should contact the Swedish Plant Protection Service and discuss the matter with such Service. Newdick so *133 informed Izaak Wolf, advising that any such waiver should be transmitted to Conkle, and that before any Maine officials could execute the Swedish certificate, they would have to be advised by Conkle of such a waiver.
For the reasons already indicated, there was no discussion of ring rot between Conkle an&Newdick.
15. On March 26, 1956, Izaak Wolf cabled Arnold Wolf, who at that time was in Holland, advising that a waiver of point 5 of the ‘Swedish certificate had to be obtained and requested Arnold Wolf to obtain such a waiver and to advise Conkle thereof immediately by cable.
Both on the following day and on March 28, 1956, Izaak Wolf, who remained in Maine, telephoned Conkle, discussed the situation with him, and inquired whether Conkle had as yet heard from Sweden as to the waiver, but at the times of these calls, Conkle had not as yet been so advised.
16. Pursuant to Izaak Wolf’s cable, Arnold Wolf, on or about March 28, 1956, went to Sweden and conferred with Granhall about the Swedish requirements for importing potatoes from the United States and particularly about the inability of the Maine Department of Agriculture to execute the Swedish phytosanitary certificate because of the point 5 Colorado beetle problem. Granhall stated that, despite the Colorado beetle obstacle, he would permit the importation of Maine potatoes provided that the bags in which the potatoes were contained were treated with a chemical called rotenone (which he felt would adequately control the Colorado beetle), that the other requirements of the Swedish regulations were complied with, that valid certificates accompanied the shipments, and that they passed Swedish inspection on arrival. At that time, Arnold Wolf did not ask for, nor did Granhall furnish him, a copy of the Swedish laws or regulations pertaining to the importation of potatoes into Sweden, nor did Wolf obtain such a copy from any other source in Sweden. Granhall was motivated to make an exception in this instance insofar as the Colorado beetle was concerned because of the existing potato shortage.
Although, as a plant pathologist, Granhall well knew that ring rot exists in potatoes grown in the United States, the subject of ring rot or any other disease was not specifically *134 mentioned during the conference. Granhall’s mind was not focused on tbe ring rot problem about which he had little concern insofar as the proposed import of table, as distinguished from seed, potatoes was concerned, and evidently he did not remember the addition of ring rot to the list of dangerous diseases the previous September. Consequently, the bulk of the discussion was concerned with the Colorado beetle, which was the only problem that had been raised by the Maine and United States Government officials. Arnold Wolf then requested Granhall to cable Conkle at the United States Department of Agriculture about the waiver of point 5 and on March 28, 1956, Granhall sent the following cable to Conkle:
CERTIFICATE SWEDEN TOINT 5 ELIMINATED PROVIDED BAGS ARE TREATED ROTENONE FROM THE OUTSIDE.
This information was then conveyed by Conkle to Newdick. With the waiver of point 5, neither Conkle nor Newdick saw any obstacle to the execution of the Swedish certificate by the Maine inspectors. Promptly thereafter, Newdick advised Izaak Wolf, who was still in Maine, that Conkle had informed him that point 5 had been waived by Sweden and that it would now be possible for the Maine officials to execute the Swedish certificate. Izaak Wolf himself immediately confirmed the elimination of point 5 by a long distance telephone call which he personally made to Conkle.
17. Plaintiff thereafter entered into contracts to sell to various Swedish importers 103,079 bags of 11/2- to 214-inch potatoes, to be shipped from Searsport, Maine. In turn, to fulfill these commitments and in reasonable expectation of further sales, plaintiff entered into contracts in the United States and in Canada for the purchase of 106,184 bags of Maine and Canadian potatoes.
18. (a) On April 17,1956, the Maine Department of Agriculture officials inspected and executed certificates at the dock at Searsport, Maine, covering 54,079 bags of potatoes for export by plaintiff to Sweden on the SS EUerbeJc, 40,648 of which were Maine potatoes and 13,431 Canadian potatoes.
On April 27, 1956, these officials inspected and executed certificates at such dock covering 13,290 bags for export by *135 plaintiff to Sweden on the SS Nebraska, 12,836 of which were Maine potatoes and 454 Canadian potatoes.
On May 5, 1956, these officials inspected and executed certificates at such dock covering 17,195 bags of potatoes for export by plaintiff to Sweden on the SS Boogavilla, 14,499 of which were Maine potatoes and 2,696 were Canadian potatoes. ■
All the inspections were made by random sampling.
All the Maine potatoes were covered by the Swedish form of phytosanitary certificate except that as to point 5, in substitution for the statements set forth in finding 10, they stated “that the containers of the potatoes have been treated with Eotenone and that there are no Colorado beetle or J ap-áñese beetle in the sacks.” These certificates were executed by Newdick.
All the Canadian potatoes were covered by certificates stating they were “dusted with Eotenone dust as provided for in the Phytosanitary certificates furnished by this Department to cover the Maine potatoes loaded on this same ship on the same dates.” These certificates were executed by New-dick’s assistant, Paul J. Eastman. No certificates of the Swedish phytosanitary type were executed by the Maine officials with respect to the Canadian potatoes, nor does the record indicate that any such certificates accompanied such potatoes.
All the 84,564 bags of potatoes hereinabove described were shipped to Sweden in partial fulfillment of the contracts plaintiff entered into with the Swedish importers, with each bag, consisting of 100 pounds, being tagged with plaintiff’s name as the seller.
(b) The potatoes had been shipped to Searsport in railroad cars. They had been inspected prior to being loaded on the cars by Federal inspectors. After such inspection the cars were sealed. Upon their arrival at Searsport, an inspector employed by plaintiff broke the seals on the cars and reinspected them to make certain that no freezing damage had resulted during transit, that the potatoes had otherwise arrived in good condition, and that only potatoes of sound quality were being exported. He was also responsible for making certain that all bags were dusted with rotenone. *136 Thereafter, tbe potatoes were inspected at the dock by the Maine officials, and the export certificates executed, as set forth in subparagraph (a) above.
(c) Had Newdick known of Sweden’s prohibition against ring rot, he would not have executed the Swedish forms of certificate covering the 67,983 bags of Maine potatoes, since it is not possible to certify that ring rot is completely absent from a shipment of potatoes from the State of Maine. No inspection of the potatoes was in fact made for ring rot.
Since the importation of United States potatoes to Sweden had theretofore been prohibited because of the Colorado beetle, these were unusual shipments. Newdick was cognizant of the general ring rot problem at the time. He assumed that because the Swedish form of phytosanitary certificate did not mention ring rot, Sweden had no prohibition against it, which surprised him. Nevertheless, he made no mention of ring rot in any of his conversations with Conkle or Izaak Wolf.
19. During March and April 1956, there were, because of the potato shortage fears above described, heavy exports of potatoes from Holland to northern European countries, especially England and Sweden. On April 6,1956, Holland announced it would embargo all potato exports, the embargo to take effect in 15 days, i.e. on April 21,1956. Holland was at that time fearful of a potato shortage of its own. In early May 1956, however, when the storage ground pits were opened for the first time in the various countries, it was found that the potatoes had emerged from the severe winter in quite good condition. Accordingly, when the local farmers commenced delivering their stored potatoes and all the imported potatoes had arrived, it turned out that there was a surplus rather than a shortage, and with the termination of shortage fears, potato prices collapsed. The collapse occurred in England on May 5,1956, and in Sweden shortly thereafter. This was shortly prior to the arrival at Stockholm of the first shipment of potatoes by plaintiff on the SS EUerbek. Prices declined steadily from a high of $5.25 per 100 pounds on May 5 to a low of $2.10 on June 30,1956.
20. (a) The SS Ellerbek arrived in Stockholm on May 11, 1956.
*137 (b) In tbe early part of May 1956, and just prior to tbe arrival of tbe Ellerbek, it was definitely established (thus confirming some reports from southern Sweden during tbe 1955-56 winter) that some Swedish potato farms were infected with ring rot. This was the first time any real concern about ring rot was felt in Sweden.
(c) As stated, although the presence of ring rot in potatoes does not render them unfit for human consumption, the disease will spread if infected potatoes are planted. The potatoes herein involved were labeled and intended for use as table potatoes. However, they were arriving during the potato planting season in Sweden, which commences in March and ends in June. Despite their labeling and intended use, there was concern by the Swedish authorities that they might be diverted to use as seed potatoes, especially since these potatoes were of a variety with which the Swedish people were unfamiliar.
(d) Based upon the considerations set forth in paragraphs (b) and (c), and unquestionably upon the fact that a potato shortage or the threat of one no longer existed anyway, as set forth in finding 19, the Swedish authorities decided to invoke the ring rot promulgation of September 19, 1955 (finding 3), and to subject the potatoes herein involved to a very rigorous inspection for ring rot.
21. On May 11, 1956, an inspection, by random sampling, of the Ellerbek cargo at Stockholm by the Swedish authorities disclosed evidence of ring rot in the potatoes, which was confirmed by a subsequent inspection at Goteburg, Sweden, on May 14,1956.
On May 17, 1956, the SS Nebraska arrived at Stockholm and ring rot was also found in the potatoes thereon.
On May 25,1956, the SS Boogmilla arrived at Stockholm and ring rot was also found in its potatoes.
All of the three cargoes of potatoes were rejected in their entireties.
22. (a) Prior to the arrival of the first vessel, Izaak Wolf went to Sweden to handle the details of the sales transactions. Consequently, he was already there when the first rejection occurred on May 11,1956. Plaintiff’s office in Chelsea, Massachusetts, was immediately advised thereof by a telephone *138 call from Arnold Wolf, who was in Holland at the time, and on the same day plaintiff sent the following cable to the American Embassy in Stockholm:
OUR SHIPMENT ELLERBEK APPROXIMATELY NIFTY FOUR THOUSAND BAGS POTATOES REFUSED IN STOCKHOLM STOP PLEASE PROTEST TO THE SWEDISH PLANT INSTITUTE AGAINST THE REFUSAL OF HAVING POTATOES ENTERED NOTWITHSTANDING THE FACT THAT OUR CERTIFICATES HAVE BEEN ISSUED IN CONFORMITY WITH THEIR CABLE SENT TO THE RESEARCH DEPARTMENT DEPARTMENT OF AGRICULTURE WASHINGTON DO STATING SWEDISH REGULATIONS.
(b) On the same day, plaintiff also advised Newdick in Augusta, Maine, and Conkle in Washington, D.C., that the Swedish authorities had rejected the potatoes on the Eller-beh despite the certificates Newdick had executed. Plaintiff requested them to ask the American Embassy in Stockholm to intercede in its behalf with a view to getting the cargo released. Thereupon, Newdick sent the following cable to the American Embassy in Stockholm:
BASED UPON CABLE RECEIVED FROM SWEDISH PLANT INSTITUTE THROUGH THE DEPARTMENT OF AGRICULTURE WASHINGTON DC CERTIFICATES HAVE BEEN ISSUED IN CONFORMITY WITH THEIR REGULATIONS FOR SHIPMENTS OF POTATOES. I NOW LEARN THAT ENTRY HAS BEEN REFUSED. WILL YOU KINDLY PROTEST TO THE SWEDISH PLANT INSTITUTE AGAINST THIS PROCEDURE. CARGO SHIPPED SS ELLERBEK.
(c) This was the first time in Conkle’s experience that an export shipment had, on the basis of a regulation still in process and not made available by the Department of Agriculture to United States exporters, been rejected by the foreign country although the shipment was covered by a form of phytosanitary certificate approved by the foreign country and which did not specifically mention the disease which was the basis of the rejection. Nevertheless, neither Conkle nor the Department of Agriculture, due to policy considerations involving our relations with a foreign government, took any such similar protest action. The matter, however, came to the attention of the Foreign Agricultural Service of the *139 Department of Agriculture which made inquiry of the Agricultural Attache in the American Embassy in Stockholm as to what had happened, since the Service was encouraging the export of United States surplus commodities, such as potatoes. On May 14,1956, the Agricultural Attache sent to the Service the following cable:
POTATOES ELLERBEK REFUSED ENTRY TEMPORARILY BECAUSE SMALL QUANTITIES INFECTED RINGROT. SITUATION UNDER INVESTIGATION. EVERY EFFORT BEING EXTENDED PROCURE RELEASE. IDO [iZAAX] WOLF HERE. ARNOLD WOLF ARRIVING TOMORROW
and on May 15, 1956, the Service, by telegram, sent to plaintiff a copy of such cable.
23. Arnold Wolf arrived in Sweden from Holland on May 16, 1956, and the Wolfs then conferred with Granhall, protested the rejection, and attempted to get the embargo on the potatoes lifted. The Wolfs took the position that the Swedish authorities could not properly reject the shipments since they were covered by properly executed forms of Swedish phytosanitary certificates and, further, that such forms said nothing about ring rot. However, Granhall, relying on the September 1955 ring rot promulgation, insisted that he had the right to cause the rejection. Upon Arnold Wolf’s inquiry as to why Granhall had not mentioned anything about ring rot during their conference of March 28, 1956 (finding 16), Granhall stated that he did not feel that such mention was necessary, since he had given the United States Embassy in Stockholm a copy of the new Swedish regulations as long ago as November 1955 (finding 7) in which was included the ring rot regulation. This was the first knowledge the Wolfs and plaintiff had about this ring rot regulation. At first, Granhall insisted that the potatoes could not be sold in Sweden at all because they were infected with ring rot. However, he subsequently gave permission, as an exception to the regulations, to their sale provided they would be removed from their bags, treated with a chemical which would prevent their sprouting and consequent use as seed potatoes, and that they be rebagged and appropriately labeled as having been so chemically treated. Plaintiff *140 reasonably concluded that it would not be possible to sell any substantial amount of the potatoes under these restrictions.
24. Upon the receipt on May 15,1956, of the advice from the American Embassy at Stockholm that ring rot was the cause of the rejection (finding 22(c)) and the information from Granhall on May 16,1956, that the ring rot promulgation had been delivered to the Embassy in November 1955 (finding 23), plaintiff’s office, on May 25, 1956, requested Conkle to furnish it with a copy of the promulgation and inquired how it happened that Conkle was not apprised of it and had not advised Newdick with respect thereto. On the same day, Conkle sent to plaintiff the following letter:
In accordance with your request of today, May 25th, we are enclosing a copy of the cablegram of March 28 from Dr. Granhall, Swedish Plant Protection Institute, to this office regarding elimination of point 5 in the phytosanitary certificate required by Sweden for potatoes. We are also enclosing a copy of B.E.P.Q. [Bureau of Entomology and Plant Quarantine] 439 Ke-vised, February 14,1950, on page 5 of which it is stated that potatoes from the United States are prohibited entry into Sweden, and also a copy of a phytosanitary certificate form transmitted to Mr. D. M. Kubel, Director of the Fruit and Vegetable Division, Foreign Agricultural Service of this Department, with a letter to him [finding 12] from the office of the Agricultural Attache of the American Embassy in Stockholm. In that letter it was stated that the Agricultural Marketing Board had granted licenses for importation of Maine potatoes on a trial basis.
At the time the question of a shipment of potatoes to Sweden came up in March all information given on Swedish requirements was based on the above data. Your office was advised at that time in a telephone conversation to get in touch with Swedish authorities and find out exactly what requirements would need to be met in order to ship potatoes to that country and whether a phytosanitary certificate issued by an inspector of the State of Maine would be acceptable. Apparently it was learned that Maine inspectors could not certify to point 5 and subsequently this office received the cablegram (copy enclosed) from Sweden in regard to point 5. That information was transmitted by tele *141 phone to Mr. E. L. Newdick, Chief, Division of Plant Industry, State Department of Agriculture, Augusta, Maine, and it is understood that the potatoes were treated and certified accordingly.
In subsequent correspondence from Sweden through the Department of State concerning Sweden’s embargo of your shipment of potatoes reference was made to information on their plant quarantines which had been submitted to this office in November 1955. On checking our files material has been found which had been received in November and was forwarded to our New York office for summarization and eventual publication as a revision of our present summary of the plant quarantine import requirements of Sweden. Such summaries are prepared and issued as rapidly as the material received can be summarized and sent to foreign countries for their review and approval of final drafts and returned to this Branch. Unfortunately, the revision of the Swedish summary, to incorporate the new restrictions, has not been completed.
A copy of the material received from Sweden in November is also enclosed and on page 9 of that material ring rot of potatoes is listed as a plant disease considered to be particularly dangerous to Swedish agriculture. We sincerely regret that this information had not yet been generally distributed.
25. As a result of the embargo, the question arose as to the liability of the Swedish purchasers on their contracts of purchase with plaintiff. Plaintiff insisted that, with respect to the shipped potatoes, the purchasers were nevertheless liable on their contracts. It retained a Swedish attorney and negotiated with the Swedish purchasers. Under the threat of suit, one of the purchasers paid the full price for the shipped potatoes for which he contracted. However, as to other potatoes, plaintiff eventually made settlement agreements whereby the purchasers took the potatoes at reduced prices, or were permitted to cancel certain portions of their commitments. Plaintiff disposed of part of the portion left on its hands at any price it could get. The balance it could not dispose of at all. As stated, the restrictive conditions imposed by Granhall concerning their use as table potatoes and the adverse publicity in Sweden with respect to the transaction, for the most part prevented their dis *142 position as table potatoes. Only a small part was ultimately sold for such use. Some were salvaged as animal feed. Much of the cargo, held up in lighters pending negotiations, deteriorated. Most of the potatoes were, under Granhall’s supervision, ultimately destroyed. Heavy losses were suffered by both the plaintiff and the purchasers. One of the purchasers went into bankruptcy as a result of this transaction. Plaintiff was able to realize on the 84,564 bags of potatoes sent on the three vessels the sum of 764,375.89 Swedish kronor, which was, at the then rate of exchange, equivalent to $146,766.97.
26. At the time of the rejections in Sweden, there still remained in the United States 21, 620 bags of potatoes which plaintiff had purchased for sale in Sweden. These were not shipped and plaintiff resold them for the gross amount of $56,957.93, in connection with which disposition, however, it incurred heavy expenses.
27. Plaintiff incurred total expenses in connection with the potato transactions herein involved of $323,383.89.
Deducting therefrom the proceeds plaintiff received from the sales of the potatoes in Sweden, totaling $146,766.97 (finding 25) and from the sales of the potatoes in the United States, totaling $56,957.93 (finding 26), making total receipts from all sales the sum of $203,724.90, results in a net loss to plaintiff on the potato transactions herein involved, of $119,658.99.
28. As shown, plaintiff had commitments for the sale of 103,079 bags of potatoes in Sweden. It purchased 106,184 bags of United States and Canadian potatoes to fulfill these commitments as well as to supply a small additional amount which it felt it would have no trouble in selling. The original contracts for the sale of the potatoes were on a basis of $3.75 per bag.
As also shown, there was a price break in Sweden commencing in early May, and it is therefore speculative as to what price plaintiff could have realized for the 3.105 bags it purchased in excess of its commitments. For the 103,079 bags for which plaintiff had commitments, which were at $3.75 per bag, plaintiff would have realized the amount of $386,546.25 thereon. Because of the speculative nature of *143 the price plaintiff would have been able to obtain for the 3,105 bags, it will be assumed for the instant purpose that plaintiff could have sold them at least at the lowest price to which potatoes fell during the May-June price break, i.e., $2.10 per bag (finding 19), or the amount of $6,520.50. On this basis, plaintiff would have realized the gross amount of $393,066.75 for the 106,184 bags.
Plaintiff’s total costs and expenses in connection with the sale of said 106,184 bags would reasonably have been $325,-513.29. This includes the cost of the potatoes at $1.60 per bag, as well as all the other costs and expenses involved, the largest of which would have been for ocean freight and for the hire of stevedores.
Thus, plaintiff would have realized a profit of $67,553.46.
Plaintiff would have paid to Wolf & Wolf, a commission of 10 percent of such profit for its services in financing the transaction and, as plaintiff’s agent, in handling the foreign exchange and other international aspects of the matter. Such commission would thus have amounted to $6,755.35, which would have left plaintiff with a net profit of $60,798.11, or an average of approximately 57 cents per bag on the basis of 106,184 bags.
29. (a) On July 15,1957, there was introduced in the House of Eepresentatives, 85th Congress, 1st Session, House Bill H.K. 8728, which read as follows:
A BILL
For the relief of the Suffolk Farms Packing Company
Be it enacted, by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Suffolk Farms Packing Company, of Chelsea, Massachusetts, the sum of $119,862. Such sum shall be in full satisfaction of all claims of the said Suffolk Farms Packing Company against the United States Government for compensation for losses incurred by such company in connection with the shipment of agricultural commodities to the country of Sweden pursuant to reputedly dependable, but actually inadequate and incomplete, information received from the United States Department of Agriculture.
*144 (to) On April 1,1958, the House of Kepresentatives, 85th Congress, 2d Session, agreed to House Eesolution 489, which read as follows:
Resolved, That the bill (HR. 8728) entitled “A bill for the relief of Suffolk Farms Packing Company”, together with all accompanying papers, is hereby referred to the Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with provisions of said sections and report to the House of Representatives at the earliest practicable date, giving such findings of fact, including an analysis of the amounts included as the basis for the sum stated in the bill, and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal and equitable, against the United States.
30. The Resolution requests “* * * an analysis of the amounts included as the basis for the sum stated in the bill * * The sum of $119,862 set forth in the bill is described as “compensation for losses” incurred by plaintiff.
On July 9,1958, plaintiff filed its petition herein pursuant to the Resolution. It claimed therein that its total loss on account of the potato transactions herein involved amounted to $239,724.85, but that it had claimed of the Congress, and was claiming before this court, “only fifty percent of the total loss sustained by plaintiff but set by plaintiff in its own judgment as the only percentage of the total claim which at the time of the filing of HR. 8728 would, realistically, be then considered by the Congress.” Fifty percent of $239,724, set forth in the petition as plaintiff’s alleged loss, is $119,862, as set forth in HR. 8728. The petition seeks the recovery of said amount of $119,862. At a pretrial conference on December 19, 1958, plaintiff reaffirmed the basis of its claim as 50 percent of its loss.
As shown by findings 25, 26, and 27, plaintiff’s total loss (exclusive of lost profits) was in fact only $119,658.99, rather than the $239,724 set forth in the petition. Fifty percent of such loss of $119,658.99 would be $59,829.49.
31. The losses herein incurred by plaintiff could have been avoided as follows:
*145 (a) The Swedish Importers. Had the Swedish importers fully investigated the laws and regulations of their own country before attempting to import the potatoes, they would have learned about the ring rot prohibition. With such discovery they would not have attempted to import potatoes from the United States because of the common knowledge that practically all areas in the United States in which potatoes are grown are infected with ring rot. Exporters normally place heavy reliance on the importer’s knowledge of the regulations of the importer’s country. Here, in response to plaintiff’s inquiry from the prospective Swedish importers as to what the Swedish requirements were, plaintiff was furnished by them with only an approved form of Swedish phytosanitary certificate which made no specific mention of ring rot. Obviously, the prospective Swedish importers did not know of their own country’s newly adopted ring rot regulation, and made no attempt to obtain from Swedish official sources a complete set of the then existing rules and regulations relating to the import of potatoes.
(b) Plaintiff Exporter. Plaintiff itself, as the exporter, could have obtained directly from Swedish official channels or otherwise a complete set of Sweden’s then existing laws and regulations before it embarked upon this unusual Swedish-United States potato deal. Instead, it relied on information from Swedish commercial channels, and on conversations with a Swedish governmental official and with officials of the United States and the Maine Departments of Agriculture. While it is not usual for the potato exporter to ascertain from the foreign country what their import laws and regulations are, chief reliance normally being placed on the importer’s knowledge of the rules and regulations of his own country, and while plaintiff’s reliance upon both unofficial and official Swedish and American sources is therefore understandable, nevertheless exporters on occasion do undertake the burden of definitively ascertaining for themselves the exact laws and requirements of the foreign country.
Furthermore, in this case, Arnold Wolf had gone to Sweden prior to the importation for the express purpose of ascertaining Sweden’s requirements. While there, he dis *146 cussed the situation with Granhall, the most important Swedish official concerned. Thus, plaintiff was in the fortunate position of already having made contact with the proper official of the importing country. All Wolf had to do while he was there was to obtain from Granhall, or Gran-hall’s Service, or other Swedish official sources, a copy of all of Sweden’s official laws and regulations pertaining to the matter. Had he done so, he himself would have discovered the ring rot promulgation. Although his discussion with Granhall appears to have been concerned generally with the form of Swedish phytosanitary certificate which the American officials would have to execute, and specifically, with the Colorado beetle and the references in the certificate thereto, and although the form made no specific reference to ring rot, nevertheless the form did specifically state that the shipment would have to conform “with the current phytosanitary regulations of Sweden both as stated in the” certificate “and otherwise."
(c) The Swedish oficiáis and Sweden’s form of Phyto-sanitary Oertificate.
1. Had Granhall, in his conversation with Arnold Wolf prior to the importation, recalled his own relatively recent ring rot promulgation and mentioned it, both Granhall and Wolf would have recognized the impossibility of the proposed importation unless that matter too was waived. Since he was responsible for, and indeed was the author of, the promulgation, he was the most likely source of its knowledge and its being made known. Yet, evidently because he was so little concerned about ring rot at the time, he presumably forgot about the existence of the promulgation when he conferred with Wolf. The same is true of Granhall’s contracts with the American Embassy in March 1956. At that time, in connection with proposed shipments of Maine potatoes to Sweden, Granhall delivered a form of Swedish phytosani-tary certificate to the Agricultural Attache. Had he thought of or mentioned ring rot at that time, it would have become obvious to all concerned that Maine potatoes could not qualify.
*147 2. The Swedish form of phytosanitary certificate (which followed the standard form adopted by the Eome Convention) was in itself confusing in that it specifically mentioned certain prohibitory diseases and pests. It was quite understandable that an importer or exporter would not have concluded that another important but unmentioned prohibitory disease was lurking in some regulation. The certificate specifically mentioned wart disease, potato root eelworm, potato moth, Colorado beetle, and Japanese beetle. It would seem that promptly after the adoption of the ring rot regulation, the Swedish authorities would have changed their form of certificate so as to add ring rot thereto, especially when it was common knowledge that such important reliance is placed on the form by importers, exporters, and the foreign official executing the certificate.
3. Because of the unimportance which ring rot had theretofore played in Sweden, ring rot not being a cause of rejection prior to September 1955, it would seem that the Swedish officials could have approached the entire problem more sympathetically. Although some evidence of ring rot did appear in Swedish farms for the first time just prior to the arrival of the three ships herein involved, nevertheless these potatoes were being sold, and were labeled, as table potatoes. The danger of their contributing to any ring rot disease problem on Swedish farms lay only in their use as seed potatoes, which was not contemplated. The conclusion is inescapable that the rigorous ring rot inspection to which the potatoes were subjected stemmed at least in part from the fact that just prior to the arrival of the ships, the potato shortage terminated. Because of the potato shortage, the Colorado beetle problem, which Sweden had always considered to be important, was waived (on condition). Had the shortage persisted when the potatoes herein involved arrived, it seems highly probable that the ring rot matter, about which Sweden had theretofore been little concerned, would, considering that these were table potatoes and the part the Swedish officials had themselves played in encouraging the importation, also have been waived.
*148 (d) The United States Department of Agriculture Officials. Conkle was in a position to 'have ascertained the existence of the Swedish ring rot promulgation and to have advised all interested parties. He was specifically asked by other interested Department of Agriculture officials to inform them of the Swedish requirements at the March 15, 1956, meeting at the Department. The ring rot regulation had been in his office in translated form since November 1955. A check by him of his own office files concerning any regulations issued subsequent to the last Swedish summary and which may have been in current process of summarization would have disclosed the promulgation in question. Had he known of it, he surely would have informed both Izaak Wolf and. Newdick during his subsequent telephone conversations with them. Since the only question he had raised concerned the Colorado beetle, and the waiver with respect thereto came to him from Granhall, and since there followed his statements to Izaak Wolf and Newdick that the certificates could now be executed by Newdick, there was, in light of the reliance customarily placed upon him and the Department of Agriculture in such matters, seeming assurances that, with the waiver, there was no obstacle to the certification and the importation.
(e) The Maine Department of Agriculture Officials. Since the Swedish officials were in this instance accepting certificates executed by State rather than Federal officials, it was ultimately Newdick’s responsibility to make certain that his certification was accurate. Although the State and Federal officials cooperate closely in such matters, with the State officials customarily relying heavily on the extensive files, knowledge and experience of the Federal officials, as here they did, nevertheless the State officials here obviously had an independent responsibility by reason of their assumption of the duty of executing the certificates.
Technically Newdick’s certificates were accurate in that they stated merely that the shipments were examined by Maine officials and found “to the best of their knowledge to be substantially free from injurious diseases and pests,” and *149 that each, shipment was “believed to conform” with Sweden’s regulations. Nevertheless, it appears that all he did was to rely on the Federal officials, without attempting to make any independent investigation. As does the Federal Department, the Maine Agriculture Department also is supposed to keep informed of the requirements of foreign countries. Potatoes are an important Maine crop. There is a Maine Potato Council consisting of approximately 3,500 growers of potatoes in Maine. They are constantly concerned with the export of Maine potatoes and the markets for and requirements of foreign countries with respect thereto. In March 1956, the Council sent a representative to certain foreign countries, including Sweden, to investigate the possibility of exporting Maine potatoes to Sweden. This representative talked to Granhall, among others, and was advised by Granhall at the time of the waiver of point 5 on the import certificate concerning the Colorado beetle. (Here again, Granhall seemingly failed to advise concerning ring rot and the Council’s representative too relied only on what other people told him, making no direct source investigation of his own.) The entire subject was an important and live one at the time to the potato growers of the State of Maine, and, presumably to the State officials who, like the Federal officials, may use all available sources to obtain the necessary information. It is permissible for such officials, as they in fact have done (subsequent to the incident herein involved), to contact foreign countries directly to ascertain their requirements.
In this particular instance, Newdick was conscious of the ring rot problem and indeed was puzzled by the seeming absence of a Swedish regulation with respect thereto. Had Newdick contacted Sweden prior to executing the certificates and obtained from the Swedish officials copies of their current laws and regulations, or had he made direct inquiry about ring rot, thus giving voice to the query in his mind, he would unquestionably have discovered the ring rot promulgation and would have advised in advance that he could not execute the certificate. Thus, lacking a waiver of the ring rot matter, the shipments would not have been made.

 Subsequently the form of the certificate was changed so as to eliminate any references to particular diseases or pests and instead to refer solely to the list of the particular country involved.

 At the present time such a record is kept. In addition, the summarization work has been moved from New York to Washington, where closer supervision over it can be maintained.